## ANTICIPATORY SEARCH WARRANT ON WRITTEN AFFIDAVIT

ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v. | DOCKET NO.  **SA15-422M**  MAGISTRATE'S CASE NO. |
| **THE PREMISES KNOWN AS:**<br>Checked luggage, carry-on luggage, and personal belongings of Luiz Eduardo Baptista, also known as "Scotty Gergis Oram" | **TO:**<br>**ANY SPECIAL AGENT(S) WITH DIPLOMATIC SECURITY SERVICE OR ANY OTHER AUTHORIZED OFFICER** |

Affidavit having been made before me by the below-named affiant that he/she has reason to believe that on the premises known as

### SEE ATTACHMENT A-2

in the Central District of California there will be concealed certain property, namely:

FILED
CLERK, U.S. DISTRICT COURT
MAR 3 1 2016
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

### SEE ATTACHMENT B

and as I am satisfied that there is probable cause to believe that <u>upon the occurrence of the triggering event described in Section VII of the search warrant affidavit</u>, the property so described will be concealed on the person or premises above-described and the grounds for application for issuance of the search warrant exist as stated in the supporting affidavit which is incorporated herein by reference and attached hereto.

**YOU ARE HEREBY COMMANDED** to search on or before _____ fourteen (14) days _____
(not to exceed 14 days) the person or place named above for the property specified, serving this warrant and making the search at any time in the day or night <u>upon the occurrence of the event described above</u>, and if the property be found there to seize it, leaving a copy of this warrant and receipt for the property taken, and prepare a written inventory of the property seized and promptly return this warrant to <u>the duty U.S. Magistrate Judge</u> as required by law.

| NAME OF AFFIANT | SIGNATURE OF U.S. MAGISTRATE JUDGE | DATE/TIME ISSUED |
|---|---|---|
| **Keith Spain, Diplomatic Security Service** | The Honorable Karen E. Scott | 8/14/15   1:00PM |

AUSA: Scott D. Tenley x2829

**RETURN**

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
|---|---|---|
| 8/14/2015 | 8/16/2015 @ 10:50 AM | LUIZ BAPTISTA |

INVENTORY MADE IN THE PRESENCE OF _LUIZ BAPTISTA_

INVENTORY OF PROPERTY TAKEN PURSUANT TO THE WARRANT

1) ONE SAMSUNG CAMERA CONTAINING PHOTOS

2) ONE US PASSPORT FOR SCOTTY GRIMES W A BRAZILIAN VISA

3) ONE BRAZILIAN PASSPORT FOR LUIZ EDUARDO BAPTISTA # FB169299

4) (2) AMERICAN AIRLINES TICKETS LAX→MIA AND MIA→GIG FOR SCOTTY GRIMES ORAM

5) I-797 FOR LUIZ BAPTISTA

6) BRAZILIAN EXPRESS EMAIL FOR SCOTTY ORAM

7) (2) SD CARDS (LX SERIES 32 GB & SILICON POWER 16 GB)

8) (2) THUMBDRIVES (INTEL & VIP WANTS YOU!)

9) DEBIT CARD FOR SCOTT ORAM, SSAN CARD FOR SCOTT ORAM, US EAD CARD FOR LUIZ E. BAPTISTA

10.) PANASONIC SDR-H80 VIDEOCAMERA, S/N E9IA15621

11) NEXSTAR HARD DRIVES, MODEL NST-280S3

12) WD ELEMENTS HD S/N WX11E44 DRA50

13) MACBOOK PRO, S/N W89450296GT

14) NOKIA CELL PHONE IN A BLUE CASE

**CERTIFICATION**

I swear that this inventory is a true and detailed account of all the property taken by me on the warrant.

_Signature_

Subscribed, sworn to, and returned before me this date.

_KAREN E. SCOTT_
**U.S. JUDGE OR MAGISTRATE**

3/31/16
**DATE**

## AFFIDAVIT

I, Keith Spain, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Department of State, Diplomatic Security Service ("DSS"), and have been so employed since 2007.  I am currently assigned to the Los Angeles Field Office.  I have received training in federal criminal laws at the Federal Law Enforcement Training Center in Glynco, Georgia, and at the Diplomatic Security Training Center.  Those trainings covered laws relating to, and the investigation of, identity theft, visa fraud, and passport fraud crimes.  My duties include investigating passport and visa fraud.  I have also participated in the execution of search warrants seeking evidence of identity theft, visa fraud, and passport fraud.  I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered to conduct investigations of, and to make arrests for, the offenses enumerated in Title 22, United States Code, Section 2709.

### II. PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of a criminal complaint and arrest warrant charging LUIZ EDUARDO BAPTISTA ("BAPTISTA") with violating Title 18, United States Code, Section 1542 (false statement in application and use of passport).

3.    This affidavit is also made in support of the following search warrants:

     a.    A warrant to search the property located at 6072 Sydney Drive, Huntington Beach, California, where BAPTISTA is believed to reside; and

     b.    An anticipatory warrant to search the luggage and personal belongings *at LAX airport* of BAPTISTA, should BAPTISTA check in for a flight from Los Angeles International Airport ("LAX") to Brazil, through Miami, Florida, and pass through the Transportation Security Administration ("TSA") security check point at LAX; in connection with potential violations of Title 18, United States Code, Sections 1542 (false statement in application and use of passport), 1544 (misuse of passport), 371 (conspiracy), and 1028A(a)(1) (aggravated identity theft).

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. INDIVIDUAL TO BE ARRESTED

5.    The individual to be arrested is LUIZ EDUARDO BAPTISTA.

2

## IV. <u>PREMISES TO BE SEARCHED</u>

6.     The premises to be searched is located at 6072 Sydney Drive, Huntington Beach, California ("SUBJECT PREMISES 1"), further described in Attachment A-1, which is incorporated herein by reference.

## V.   <u>ANTICIPATORY PREMISES TO BE SEARCHED</u>

7.     The anticipatory premises to be searched is the checked luggage, carry-on luggage, and personal belongings of BAPTISTA ("SUBJECT PREMISES 2," and collectively with SUBJECT PREMISES 1, the "SUBJECT PREMISES"), as further described in Attachment A-2, which is incorporated herein by reference, and subject to the triggering circumstances described in Section IX.

## VI. <u>SUMMARY OF PROBABLE CAUSE</u>

8.     On or around April 9, 2015, BAPTISTA submitted a fraudulent United States passport application using the name, identity, and identification documents of Scotty Griges Oram ("Oram").  The photograph submitted with the application depicts BAPTISTA, not Oram, as confirmed by a comparison of California DMV records for both BAPTISTA and Oram.  BAPTISTA was issued a United States passport, number XXXXX8301, in the name of Oram, on or around May 4, 2015.

9.     On or around June 3, 2015, BAPTISTA submitted the fraudulently obtained United States passport to the Brazilian Consulate in Los Angeles in connection with an application for a visa to enter Brazil.  According to officials from the Brazilian Consulate and a visa courier service hired by BAPTISTA to assist in obtaining the visa, a Brazilian visa can only be obtained by

INSTRUMENTALITY PROTOCOL

submitting to the Brazilian consulate the applicant's valid passport. Furthermore, BAPTISTA's Brazilian visa application indicates that United States passport number 535468301 was submitted in connection with it, and the photograph accompanying the visa application depicts BAPTISTA, not Oram.

10. An individual purporting to be Oram, but suspected to be BAPTISTA, is currently scheduled to fly from LAX to Brazil, via Miami, Florida, on Sunday, August 16, 2015.

## VII. STATEMENT OF PROBABLE CAUSE

### A. The Fraudulent Passport Application

11. I reviewed a copy of Form DS-11, Application for a United States passport, number 760260492 (the "application"), and documentation submitted in support of the application, and learned the following:

a. The application was submitted on April 9, 2015, at the University of California, San Diego ("UCSD") Passport Acceptance Office, in La Jolla, California.

b. The application identifies the name of the applicant as "Scotty Griges Oram," born XX/XX/1974 in the state of Michigan to A.Z.O. and C.O., with a social security number of XXX-XX-7053.

c. As proof of identity, the applicant submitted a California Driver's License ("CDL") in the name of Scott Jerjis Oram, number XXXX1347, issued on May 18, 2010, with an expiration date of June 3, 2015, as well as a passport issued in the name of Scott Oram that had expired in 1989.

4                    INSTRUMENTALITY PROTOCOL

      d.   As proof of citizenship, the applicant submitted a Certificate of Live Birth in the name of Oram issued by the state of Michigan.

      e.   Attached to the first page of the application is a photograph of the applicant.  The admonishment below the photograph, which is signed by the applicant, states, in part, "the photograph attached to this application is a genuine current photograph of me."

      f.   The application indicates that a United States passport was issued on May 4, 2015 (the "Fraudulent Passport"). State Department databases indicate that the Fraudulent Passport was assigned number XXXXX8301.

12.  I compared the photograph attached to the application with the photographs in the CDL and expired United States passport submitted as proof of citizenship.  Based on my training and experience, the individual depicted in the photograph attached to the application is not the same individual depicted in the CDL and expired United States passport.

13.  On or around July 31, 2015, I spoke to Sym Marie Capps ("Capps"), the passport clerk who accepted the application for processing.  Capps told me that she did not have a specific recollection of accepting the application for processing.  Capps further stated that it is her routine and practice to compare the photograph submitted with an application to the individual standing in front of her in order to confirm that the photograph is a true and accurate depiction of the applicant.  Furthermore,

INSTRUMENTALITY PROTOCOL

based on my training and experience, I know that passport clerks are trained to confirm that the photograph submitted with an application depicts the applicant.

**B.   The Applicant is Identified as LUIZ EDUARDO BAPTISTA**

14.   I obtained California Department of Motor Vehicle ("DMV") Records for Oram, and learned the following:

a.   The DMV record is in the name of Scott Jerjis Oram.  Oram's CDL number is XXXX1347, the same CDL number as the CDL submitted in support of the application.

b.   I compared the photograph in Oram's DMV record to the photographs in the CDL and expired United States passport submitted with the application as proof of citizenship.  Based on my training and experience, all three photographs depict the same individual.  In other words, the supporting documentation submitted in connection with the application depicts Oram.

15.   I obtained California DMV Records for BAPTISTA, and learned the following:

a.   BAPTISTA was issued CDL number XXXX5205.  His date of birth is February 15, 1974.  His address is listed as 7239 Paseo Plomo, Apt. 303, Carlsbad, California 92009.

b.   I compared the photograph of BAPTISTA in the DMV record to the photograph of the applicant attached to the passport application.  Based on my training and experience, I have concluded that the photograph on the application depicts BAPTISTA, not Oram.

16.   Based on my training and experience, I believe that BAPTISTA obtained valid identity and citizenship documents in

INSTRUMENTALITY PROTOCOL

the identity of Oram -- in this case the CDL, expired United States passport, and Michigan birth certificate -- for the purpose of obtaining a United States passport in Oram's name, but with BAPTISTA's photograph.

17.  On August 7, 2015, I reviewed a National Comprehensive Report ("NCR") records check for BAPTISTA.  NCR is a report generated by Thompson Reuters, a company that consolidates public records, including addresses, driver's licenses, property deed transfers, and corporate information.  From my review of the NCR report, I learned that BAPTISTA's current address is 6072 Sydney Drive, Huntington Beach, California (i.e., SUBJECT PREMISES 1).

18.  On August 12, 2015, I spoke with Federal Bureau of Investigation SA Andrew Cho, and learned the following:

a.    SA Cho was told by Jeremy Michael of the United States Citizenship and Immigration Services that BAPTISTA is a citizen of Brazil, who entered the United States in or around 2011 on a visa that expired in 2012.

b.    BAPTISTA is currently married to a United States citizen and is seeking to adjust his immigration status based on that marriage.

## C.    BAPTISTA Obtains a Brazilian Visa Using the Fraudulent Passport

19.  On August 5, 2015, I spoke with a representative of the Brazilian Consulate in Los Angeles, California, and learned the following:

INSTRUMENTALITY PROTOCOL

a.   On June 22, 2015, the Brazilian consulate issued a Brazilian tourist visa authorizing multiple entries in Brazil to an individual purporting to be Oram.  The Brazilian visa was assigned an identification number XXXXX7MK.

b.   The visa application was submitted to the Brazilian Consulate on or around June 3, 2015, through a visa courier service called MYBRAZILVISA.

20.  On or around August 11, 2015, I spoke to Todd D. Kaplan of MYBRAZILVISA, and learned the following:

a.   Oram's visa application was submitted online through MYBRAZILVISA.

b.   In order to apply for a visa online through MYBRAZILVISA, an applicant follows a link on MYBRAZILVISA's website to a visa application hosted on the website of the Brazilian Ministry of the Exterior.  The applicant completes and submits the online application to the Brazilian Ministry of the Exterior, and is issued a receipt.

c.   The applicant then delivers to MYBRAZILVISA a print-out of the receipt, the applicant's passport, and a photograph of the applicant.  MYBRAZILVISA then submits those materials to the Brazilian Consulate for approval and issuance. Once the Brazilian Consulate issues the visa, MYBRAZILVISA returns the applicant's passport and visa to the applicant via mail.

21.  I reviewed the visa application submitted through MYBRAZILVISA by the individual purporting to be Oram.  The application indicates that United States passport number

8                    INSTRUMENTALITY PROTOCOL

535468301, issued on May 4, 2015 (i.e., the Fraudulent
Passport), was submitted in connection with the visa
application.  I also reviewed the photograph attached to the
visa application.  Based on my training and experience, the
photograph attached to the visa application depicts BAPTISTA,
not Oram (and appears to be identical to the photograph
submitted with the fraudulent passport application).

### D.   BAPTISTA's Reservations for Travel to Brazil

22.  On August 13, 2015, I learned from SA Cho that FBI SA
Meredith Burke, stationed at LAX, confirmed that an individual
purporting to be Oram has made a reservation on American
Airlines Flight 28 from LAX to Miami, Florida, departing on
August 16, 2015 at 12:15 p.m.

23.  I reviewed an email message sent to SA Cho on August
13, 2015 from the Department of Homeland Security which stated
that an individual purporting to be Oram has made a reservation
on American Airlines Flight 901 from Miami, Florida, departing
on August 16, 2015 at 9:45 p.m.  I subsequently determined
through an internet search that the destination for Flight 901
is Rio De Janiero, Brazil.

24.  On August 14, 2015, I spoke to DSS SA Jose Marquez,
who informed me that he performed a search for records of Oram's
international travel in TECS, a law enforcement database
containing travel and border crossing records.  SA Marquez did
not identify any previous travel to Brazil by Oram, nor did he
identity any future reservations for travel to Brazil by Oram.

9                    INSTRUMENTALITY PROTOCOL

25.   Based on my training and experience, the fact that
BAPTISTA is a Brazilian national, the fact that BAPTISTA
fraudulently obtained a Brazilian visa, and the fact that Oram
has no identifiable connection to Brazil, I believe that
BAPTISTA, not Oram, made the reservation to travel from LAX to
Brazil.   Furthermore, based on my training and experience, I
believe BAPTISTA will carry the Fraudulent Passport with him
when attempting to board his flight from LAX.   Based on my
training and experience, I believe he is also likely to carry
other travel and identity related documents with him during his
travel in his luggage or personal belongings.

**E.    Training and Experience Regarding Passport and Visa
        Fraud**

26.   Based upon my training and experience, and my
discussions with DSS agents who also investigate passport and
visa fraud matters, and who have executed search warrants in
connection with those investigations, there are certain
characteristics common to individuals engaged in passport fraud:

a.   All passport applicants must produce documents
and records sufficient to establish his or her United States
citizenship, identity, and eligibility for a United States
passport.   Those who attempt to obtain a United States passport,
visa, or foreign visa fraudulently maintain and submit a wide
variety of fraudulent identification documents, such as driver's
licenses, identification cards, previously issued U.S.
passports, Alien Registration Receipt cards, Temporary Resident
cards, Employment Authorization cards, or social security cards.

INSTRUMENTALITY PROTOCOL

These forms of identification may be acquired through fraud or counterfeited.

      b.   Those who have engaged in, or are engaging in, passport or identity fraud often adopt that identity in various aspects of life. This can include using the identity to acquire financial accounts, account cards, checkbooks, and loans; utilities; employment; education; and any other form of services.

      c.   Those who have engaged in, or are engaging in, passport or identity fraud often maintain these forms of identification, fraudulent documents, or tools for creating counterfeit documents in their residences. This is because storing such documents in a residence is perceived as secure, and is also readily-accessible should such documents be needed. Individuals may maintain these documents in all areas of a residence, including sheds, garages, or other buildings closely associated with the residence.

      d.   Individuals who have obtained fraudulent travel documents typically carry those documents on their person or luggage when traveling, either domestically or abroad. Those individuals may also carry documents establish his or her true identity as a means of back-up identification.

      e.   Individuals engaged in passport and visa fraud commonly use digital devices, such as laptops or smartphones, to facilitate their crimes. This may include, without limitation, creating false identity documents, communicating with accomplices, researching the passport application process,

11

INSTRUMENTALITY PROTOCOL

making travel plans, and submitting applications for travel documents such as visas.

## VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

27.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible

12                    INSTRUMENTALITY PROTOCOL

to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive

INSTRUMENTALITY PROTOCOL

could contain as many as approximately 450 full run movies or 450,000 songs.

       d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

14

INSTRUMENTALITY PROTOCOL

Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

    e.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregated from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can

INSTRUMENTALITY PROTOCOL

record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

  f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregated from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

  28. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. TRIGGERING CIRCUMSTANCES

  29. Law enforcement will execute the anticipatory search warrant if BAPTISTA checks in for American Airlines Flight 28

16

INSTRUMENTALITY PROTOCOL

from LAX to Miami, Florida, and passes through a Transportation Security Administration ("TSA") security checkpoint at LAX.

## X. ITEMS TO BE SEIZED

30.    Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence of violations of Title 18, United States Code, Sections 1542 (false statement in application and use of passport), 1544 (misuse of passport), 371 (conspiracy), and 1028A(a)(1) (aggravated identity theft), will be found at the SUBJECT PREMISES.

## XI. CONCLUSION

31.    For all the reasons described above, there is probable cause to believe that LUIZ EDUARDO BAPTISTS has violated 18 U.S.C. § 1542 (false statement in application and use of passport) and that evidence of violations of Title 18, United States Code, Sections 1542 (false statement in application and use of passport), 1544 (misuse of passport), 371 (conspiracy), and 1028A(a)(1) (aggravated identity theft), as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in Attachments A-1 and A-2.

17                        INSTRUMENTALITY PROTOCOL

_____

KEITH SPAIN, Special Agent
Diplomatic Security Service

Subscribed to and sworn before me
this _____ day of August, 2015.


_____
HONORABLE KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE

18                          INSTRUMENTALITY PROTOCOL

**ATTACHMENT A-2**

ANTICIPATORY PREMISES TO BE SEARCHED

The anticipatory premises to be searched is the checked luggage, carry-on luggage, and personal belongings ∧ of LUIS *at LAX airport* KES EDUARDO BAPTISTA, also known as "Scotty Griges Oram."

i                        INSTRUMENTALITY PROTOCOL

## ATTACHMENT B

ITEMS TO BE SEIZED

1.   The following items are to be seized from the SUBJECT PREMISES, which constitute fruits, instrumentalities, and evidence of violations of Title 18, United States Code, Sections 1542 (false statement in application and use of passport), 1544 (misuse of passport), 371 (conspiracy), and 1028A(a)(1) (aggravated identity theft):

a.   All documents related to any passport applications of LUIZ EDUARDO BAPTISTA ("BAPTISTA") or Scott Griges Oram ("Oram").

b.   All immigration related documents for BAPTISTA or Oram.

c.   All travel records for BAPTISTA or Oram, including airline tickets, boarding passes, customs declarations forms, and communications regarding travel to, or activity in, Brazil.

d.   All documents related to any Brazilian visa issued to BAPTISTA or Oram.

e.   All communications between or among BAPTISTA and Oram.

f.   All false, fraudulent, or counterfeit identification, travel, or immigration documents.

g.   All documents, materials, or items establishing the true identity of BAPTISTA or Orem, including but not limited to, California Driver's Licenses, bank statements, immigration documents, marriage or divorce records, mailing or shipping

i                     INSTRUMENTALITY PROTOCOL

records, paystubs, utility records, photographic identification documents, passports, and visas.

2. Any digital device used to facilitate the above-listed violations and forensic copies thereof.

3. With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

      i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

      iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      v. evidence of the times the device was used;

      vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

INSTRUMENTALITY PROTOCOL

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical

iii                    INSTRUMENTALITY PROTOCOL

disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

6.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 60 days from the date of execution of the warrant.  If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        c.   When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

        d.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

        e.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        f.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        g.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling

v

INSTRUMENTALITY PROTOCOL

within the list of items to be seized, the government may retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

      h.   The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending). Otherwise, the government must return the device. Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

      7.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

      a.   Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

      b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

      c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

INSTRUMENTALITY PROTOCOL

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

h.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

INSTRUMENTALITY PROTOCOL